TAD:DGR
F. #2016R00461

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -                                        Criminal Docket No. <u>16-376 (JBW)</u>

CHRISTOPHER ARROYO,

           Defendant.

- - - - - - - - - - - - - - - - -X


MEMORANDUM OF LAW IN SUPPORT OF
<u>THE GOVERNMENT'S MOTIONS IN LIMINE</u>


                                                 BRIDGET M. ROHDE
                                                 Acting United States Attorney
                                                 Eastern District of New York
                                                 271 Cadman Plaza East
                                                 Brooklyn, New York 11201


Drew G. Rolle
Assistant U.S. Attorney
    (Of Counsel)

TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................................. 1

BACKGROUND .......................................................................................................................... 1

ARGUMENT ................................................................................................................................. 6

I. THE COURT SHOULD ADMIT AND ALLOW THE GOVERNMENT TO PUBLISH ONE OF THE SEXUALLY EXPLICIT IMAGES OF A.C. AS DIRECT EVIDENCE OF THE CHARGED CRIMES................................................................................................... 6

II. THE COURT SHOULD ADMIT EVIDENCE OF THE DEFENDANT'S CREATION OF FALSE ACCOUNTS TO THREATEN AND HARRASS A.C. AND HER FAMILY AND TO POST EROTIC IMAGES OF A.C. ...................................................................... 9

   A. Legal Standard......................................................................................................... 9

   B. Application ............................................................................................................ 10

III. THE COURT SHOULD PRECLUDE ANY REFERENCE TO POSSIBLE PUNISHMENT ................................................................................................................. 13

CONCLUSION............................................................................................................................ 17

PRELIMINARY STATEMENT

The government respectfully submits this motion to request the Court issue pre-trial in limine rulings to: (1) admit a sexually explicit image of the minor victim that the defendant induced and persuaded the minor victim to create and send to him, which was recovered from the defendant's computer; (2) admit evidence of the defendant's threats and harassment of the minor victim including his public posting of erotic images of the victim on the Internet as direct evidence of the charged crimes and (3) precluding evidence, argument or reference to the punishment that may result from a conviction.

BACKGROUND

The defendant, Christopher Arroyo, is a 26-year-old male who lives in Queens. Beginning in 2012, when he was 21 to 22 years old, the defendant induced, persuaded and coerced A.C., a twelve-year-old girl who lived in North Dakota, to take naked photos and live streaming video of herself, including an image of her genitals, for the purpose of sending them to the defendant over the Internet. The defendant first targeted A.C. online while playing a video game. After the defendant found A.C., he lied to her about his age, telling her he was 17.

Shortly thereafter, they began communicating by phone and over the Internet, using Facebook and Skype. Approximately ten months later, the defendant asked for an image of A.C.'s body. When A.C. hesitated, the defendant told her that if she loved him, she would send it. A.C. complied with the defendant's first request, and she sent him an image via Facebook of her body from the waist up, in which she was wearing only a bra. Having successfully induced A.C. to send the first image, he defendant demanded more, instructing A.C. to take photos of herself in certain poses.

At the defendant's direction, A.C. sent the defendant approximately 15 images of herself over a two-year period, when she was twelve to fourteen years old. These included

images of A.C.'s genitals, images of her fully nude or displaying her bare breasts, and images of her masturbating. On multiple occasions, A.C. refused to continue sending naked photos to the defendant. In response, the defendant threatened A.C. The defendant threatened to kill himself if A.C. did not send the pictures and that he would "do something about it." Over time, his threats became more specific. For example, in the first year of communicating with the defendant, A.C. attempted to stop sending any other photos or communicating with the defendant. The defendant responded by informing A.C. that if she ended the relationship and stopped sending him images, he would start posting the images he had obtained of her on the Internet to "make her look like a slut."

In 2015, A.C. again tried to stop sending the defendant images and to end all communication with him. Once again, defendant threatened A.C. This time, the defendant created multiple social media accounts that appeared to belong third parties who knew the defendant. For example, on February 15, 2015, a Facebook account with the username "Tiffany Roush" (the "Roush Facebook") sent a torrent of messages to A.C.'s Facebook account (the "A.C. Facebook") and two other Facebook accounts as part of a four-way Facebook "chat":

| | |
|---|---|
| Roush Facebook: | waiting for [A.C] |
| Roush Facebook | that [name redacted] guy[1] didnt help the situation which caused leon[2] to be upset. |
| Roush Facebook: | hence the reason why i got the pictures |
| Roush Facebook | i dont want to do it [A.C.], please. let us talk it out |

\* \* \*

---

[1] In this message Roush Facebook uses the last name of one of A.C.'s friends. The name has been removed herein to protect A.C.'s identity.

[2] The evidence at trial will show that "leon" is a reference to "Leon Mike," a Facebook username the defendant admitted he created.

2

| | |
|---|---|
| Roush Facebook: | this will be the last account i will go to talk to [A.C.], if she blocks this, i will just go ahead and release all the pictures. |
| Roush Facebook: | i have [A.C.'s mother's]³ profile, and she has more information. i truly dont want to do this |

Minutes later, the Roush Facebook began sending Facebook direct messages to A.C. alone:

| | |
|---|---|
| Roush Facebook: | [A.C.], i need you to talk |
| Roush Facebook: | final chance [A.C.].... |

\*   \*   \*

| | |
|---|---|
| Roush Facebook: | [A.C.]. You killed it for yourself. and i have a perfect plan for you. I won't simply tell your mother. I will also do something I won't tell you about, something that will surely take this to a new level. |

\*   \*   \*

| | |
|---|---|
| Roush Facebook: | now that i got your attention |
| Roush Facebook: | this is your last warning |
| Roush Facebook: | before the nukes are pulled |
| Roush Facebook: | … |
| Roush Facebook: | now [A.C.] |
| Roush Facebook: | last go |
| Roush Facebook: | Im not kidding |
| Roush Facebook: | he will do it. and so will i. |

\*   \*   \*

| | |
|---|---|
| Roush Facebook: | hmm. |
| Roush Facebook: | fucking waiting |
| Roush Facebook: | times wasting |
| A.C. Facebook: | [Deleted Message] |

The evidence at trial will show that the defendant created and controlled the Roush Facebook Account, and he sent the above-referenced messages to A.C. In these exchanges, the defendant

---

³ In this message, the Roush Facebook used the first name of A.C.'s mother, which has been redacted because providing the full name would reveal A.C.'s identity.

3

threatened to post images of A.C. on the Internet if A.C. did not respond ("if she blocks this, i will just go ahead and release all the pictures"; "this is your last warning before the nukes are pulled").

Throughout 2015 and 2016, as A.C. repeatedly refused to continue sending the defendant additional sexually explicit images of herself, the defendant continued to threaten and harass A.C. using multiple social media accounts. The defendant registered some of these social media accounts using A.C.'s name, the names of A.C.'s friends and a name that purportedly belonged to the defendant's brother. For example, on May 6, 2015, A.C. received a Facebook message from an account with the username "Eman Tsal" (the "Tsal Facebook"). The user of Tsal Facebook claimed to be the defendant's brother and told A.C. that she needed to speak to the defendant. The Tsal Facebook threatened A.C., stating that a "group" was planning to "ruin" and "expose" A.C. if she did not respond in five days. These types of threats to A.C. continued when, on February 17, 2016 a Facebook account with username "David Smith" (the "Smith Facebook") wrote A.C. stating "hey [A.C.] still have pics of u."

The evidence at trial will show that both the Tsal Facebook and the Smith Facebook were created, controlled and used by the defendant. Indeed, the defendant admitted to FBI agents that he created these and other social media accounts to "get revenge" on A.C. Records obtained from Facebook and Time Warner will corroborate these facts, as the IP addresses used to create and access the Tsal Facebook, the Smith Facebook and the Roush Facebook discussed above, were the same IP addresses that Time Warner had assigned to the defendant's residence in Queens.

The defendant followed through on his threats to A.C. The evidence at trial will show that A.C.'s friends alerted A.C.'s family to the harassment she was enduring online. As

4

A.C.'s family members will testify, an Internet search for A.C.'s name revealed that numerous images of A.C. had been posted across the Internet, including on Facebook, the websites DeviantART, Twitch, and Imgur.[4] The DeviantART and Twitch webpages purported to be A.C.'s personal webpages and contained publicly posted images of A.C., including an image of A.C's bare chest with her breasts covered. An Imgur webpage contained multiple erotic images of A.C. In reality, neither of these pages were A.C.'s—they belonged to the defendant.

Witnesses will testify that they notified the companies that controlled these websites, and the companies removed some of the content. Notably, after the company controlling the fictitious Twitch webpage was notified, the webpage was revised to include an announcement:

> Hi my name is [A.C.] I'm a backstabber who loves to lie be spoiled and most of all, use people for my own personal use. I take pictures of me to gain attention from others. I'm from South Dekoda [sic]. and yes this is a legal picture. No nudity at all, so stop complaining!

As the evidence at trial will show, the defendant created and controlled this Twitch webpage, along with the other DeviantART and Imgur webpages.

In February 2016, the FBI was alerted to the images, threats and harassment of A.C., and they began investigating the defendant. On February 29, 2016, the FBI searched the defendant's home pursuant to a judicially-authorized search warrant and seized multiple electronic devices pursuant to the warrant. The FBI later examined the defendant's laptop and USB hard drive forensically, which uncovered multiple images of A.C. One of those images

---

[4] DeviantART is an online "social network," that allows users to post content, including images, videos and text for other users to view, share, and comment on. Imgur is an website that allows users to post and share images on the Internet.

5

depicted A.C. from behind, bending over, showing her genitals (the "CP Image"). The CP Image, along with the Erotic Images, were saved in a folder labeled with A.C.'s name.

On February 25, 2016, the FBI conducted a non-custodial interview of the defendant outside his workplace in Queens. The defendant admitted he knew A.C. and had asked her to send him nude images of herself. He admitted that he asked for and received images of A.C.'s genitals and that they engaged in mutual masturbation via Skype video chat. He stated that when A.C. tried to end their online relationship, he threatened to release images of A.C. The defendant admitted he created multiple Facebook accounts to "get revenge" on A.C. and harass her into staying with him and sending more images. The defendant also admitted that this was not the first time he had obtained sexually explicit images of minor victims.

On July 5, 2016, a grand jury in the Eastern District of New York returned a three-count indictment (the "Indictment"), charging the defendant with Sexual Exploitation of a Child, in violation of 18 U.S.C. § 2251(a), Receipt of Child Pornography, in violation of 18 U.S.C. § 2252(a)(2), and Possession of Child Pornography, in violation of 18 U.S.C. § 2252(a)(4). (Indictment ¶¶ 1–3, United States v. Arroyo, 16-CR-376 (JBW), ECF No. 12).

## ARGUMENT

I. THE COURT SHOULD ADMIT AND ALLOW THE GOVERNMENT TO PUBLISH ONE OF THE SEXUALLY EXPLICIT IMAGES OF A.C. AS DIRECT EVIDENCE OF THE CHARGED CRIMES.

Relevant evidence is admissible unless precluded by some other rule. Fed. R. Evid. 402. Of course, while evidence that goes directly to an element of the crime will be relevant, relevant evidence is "not confined to that which directly establishes an element of the crime." United States v. Gonzalez, 110 F.3d 936, 941 (2d Cir. 1997). Instead, relevant evidence "need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency." Id. Accordingly, as the Second

6

Circuit has noted in child pornography cases, "[t]he government has the 'right to present evidence . . . to establish the 'human significance' of the fact and 'to implicate the law's moral underpinnings.'" United States v. Hester, 674 F. App'x 31, 33 (2d Cir. 2016) (second alteration in original) (quoting United States v. Polouizzi, 564 F.3d 142, 153 (2d Cir. 2009)) (affirming admission of images and videos of child pornography), cert. denied, No. 16-8916, 2017 WL 1539886 (U.S. May 30, 2017).

Although relevant evidence is generally admissible, pursuant to Rule 403 of the Federal Rule of Evidence,

> [t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

Fed. R. Evid. 403. In making an assessment under Rule 403, the Court must weigh the probative value of the evidence against its dangers listed in the Rule. United States v. Awadallah, 436 F.3d 125, 132 (2d Cir. 2006).

Although a party's "willingness to stipulate" may factor into the court's assessment of the Rule 403 balance, see United States v. Monsalvatge, 850 F.3d 483, 503 (2d Cir. 2017), it is well-settled that "a criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case as the government chooses to present it." United States v. Salameh, 152 F.3d 88, 122 (2d Cir. 1998) (quoting Old Chief v. United States, 519 U.S. 172 (1997)). Consistent with that rule, the Second Circuit has affirmed district courts' rejections stipulations that would preclude the admission of child pornography, noting that such stipulations are "not an adequate substitute for the evidence offered." See Herndon v. United States, 359 F. App'x 241, 242 (2d Cir. 2010) (citing Polouizzi, 564 F.3d at 153); Polouzzi, 564 F.3d at 153.

7

Here, the Court should admit the CP Image recovered from the defendant's electronic devices as direct and highly probative evidence of the charged crimes. To convict the defendant of the crimes charged in the Indictment, the government will have to prove beyond a reasonable doubt that each count involved some visual depiction of a minor engaged in sexually explicit conduct. See 18 U.S.C. §§ 2251(a), 2252(a), 2253(a). For Counts Two and Three, charging the defendant with the receipt and possession of child pornography, the government will also have to prove the defendant's knowledge of the visual depiction's sexually explicit nature. 18 U.S.C. §§ 2242(a), 2253(a) (listing "knowledge" as an element of both crimes).

The CP Image recovered will be central to the jury's understanding of the image's sexually explicit nature and to the defendant's knowledge. Specifically, the CP Image will demonstrate for the jury (1) that the image was in fact sexually explicit and (2) how the image's sexually explicit nature would have been immediately apparent to the defendant who nevertheless saved the image in a special folder. See Herndon, 359 F. App'x at 243 (affirming admission of images of child pornography over defendant's offer to stipulate, noting that "[t]he images allowed the jury to determine how likely it was that [the defendant] knew the images were child pornography")

Moreover, as courts have recognized, in context of child pornography cases, "the pornographic nature of the image . . . plays a vital role in the government's narrative of the concrete events comprising the charged offense." United States v. Luck, (6th Cir. 2017). That narrative here is one that started with the defendant's requests for sexually explicit images of A.C. and ended with the CP Image being saved and recovered from a file folder marked with A.C.'s name.

For these reasons, the CP image is highly probative, and that probative value is not substantially outweighed by any risk of unfair prejudice. In context of this case, the CP Image to be admitted and published to the jury will be no more troubling or shocking than the other evidence to be presented. See United States v. Mercado, 573 F.3d 138, 142 (2d Cir. 2009) (affirming Rule 403 balancing and admission of 404(b) evidence where the evidence was "not especially worse or shocking than" the evidence of the charged crimes). The jury will hear in detail about the defendant's requests for twelve and thirteen-year-old girl to pose and take sexually explicit images of her body and to masturbate while on Skype video chat. Moreover, the government is not seeking to admit voluminous amounts of child pornography, which further weighs in favor of admitting the CP Image. See Hester, 674 F. App'x at 33 (noting that any risk of unfair prejudice was minimized by the limited amount of child pornography being introduced).

Accordingly, the Court should admit the CP Image and allow the government to publish the CP Image to the jury in its case-in-chief.

II. THE COURT SHOULD ADMIT EVIDENCE OF THE DEFENDANT'S CREATION OF FALSE ACCOUNTS TO THREATEN AND HARRASS A.C. AND HER FAMILY AND TO POST EROTIC IMAGES OF A.C.

A. Legal Standard

As discussed above, evidence is relevant when it tends to prove the government's case, including by "add[ing] context and dimension to the government's proof of the charges." Of course, relevant evidence is admissible. Fed. R. Evid. 402. Rule 404(b) of the Federal Rules of Evidence governs the admissibility of other act evidence, and generally precludes the use of other act evidence to establish a defendant's criminal propensity. Fed. R. Evid. 404(b). Importantly, however, evidence is "not other-act evidence within the meaning of Rule 404(b)" if

9

it is "admissible to prove material facts other than [the defendant's] propensity to commit a crime." United States v. Concepcion, 983 F.2d 369, 392 (2d Cir. 1992).

Accordingly, "[d]irect evidence of the crimes charged in the indictment is considered relevant and admissible without reference to Federal Rule of Evidence 404(b)." United States v. Kahale, 789 F. Supp. 2d 359, 381 (E.D.N.Y. 2009)), aff'd sub nom. United States v. Graham, 477 F. App'x 818 (2d Cir. 2012). This rule also applies to uncharged acts—even uncharged acts that amount to criminal activity—where those acts constitute direct evidence of the charged crimes. See, e.g., United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000). Uncharged acts may constitute direct evidence of the charged crime in a number of contexts. The Second Circuit has identified three categories of uncharged acts in particular that constitute direct evidence of the charged offense: where the act (1) "arose out of the same transaction or series of transactions as the charged offense," (2) "is inextricably intertwined with the evidence regarding the charged offense," or "is necessary to complete the story of the crime on trial." United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000) (citations and internal quotations omitted). Where evidence falls into one of these categories, it "is considered direct evidence and Rule 404 is not applicable." United States v. Fiumano, No. 14-CR-518 (JFK), 2016 WL 1629356, at *3 (S.D.N.Y. Apr. 25, 2016).

B.   Application

For the reasons discussed below, the Court should admit evidence of the defendant's threats to A.C., his posting of erotic images of A.C. (the "Erotic Images") on social media accounts he created and his online harassment of A.C. and her family, all of which constitute direct evidence of sexual exploitation of a child, charged in Count One of the Indictment. Additionally, this evidence is admissible as direct evidence of the defendant's

10

knowing receipt and possession of child pornography as charged in Counts Two and Three of the Indictment.

To prove the defendant guilty of Count One, the government must prove, among other things, that the defendant "used, employed, persuaded, induced, enticed, or coerced [A.C.] to take part in sexually explicit conduct for the purpose of producing a visual depiction of that conduct." United States v. Broxmeyer, 616 F.3d 120, 124 (2d Cir. 2010) (citation and internal quotation marks omitted). As discussed previously, for Counts Two and Three, the government must prove, among other things, the defendant's knowledge. 18 U.S.C. § 2252(a)(2) (criminalizing the "knowing" receipt of child pornography) id. § 2252(a)(4)(B) (criminalizing the "knowing" possession of child pornography).

Here, the Court should admit evidence of the defendant's threats to A.C. as direct evidence of his sexual exploitation of A.C. At trial, the government will show the jury the evolution of the defendant's scheme to collect images of A.C.—first his online chats, then soliciting images of her body, and eventually directing her to take sexually explicit images including her genitals. Admitting evidence of the defendant's threats is essential to complete the story of the charged crimes. This evidence will give the jury crucial insight into how the defendant coerced A.C. to comply with his demands to send sexually explicit images. In particular, through this evidence, the jury will learn how, within months of the defendant's first request for and receipt of images of A.C., the defendant began threating to post A.C.'s pictures online or to kill himself if she did not send more. The evidence will further show that in response to these threats, A.C. complied and produced additional sexually explicit images for the defendant. This is precisely the cause and effect criminalized by Section 2251(a). See Broxmeyer, 616 F.3d at 125 (explaining that the statutory terms used in 2251(a) "are words of

11

causation" and "the statute punishes the cause when it brings about the effect."). As such, the Court should admit evidence of the defendant's threats to A.C. as relevant direct evidence of the crime charged in Count One.

The Court should also admit evidence that demonstrates the defendant carried through on his threats because such evidence completes the story of the defendant's sexual exploitation of A.C. At trial, the jury will hear from A.C. about how the defendant used threats to intimidate and compel her to continue communicating with him and sending him the images he desperately wanted. The evidence at trial will show that while A.C. attempted to cease communications with the defendant, she feared the defendant's repeated threats to post images of her across the Internet. They will also learn that A.C.'s fears were realized over and over again when the defendant, hiding behind the veil of fake social media accounts, postedthe Erotic Images online for the world to see. These acts were part and parcel of the crime on trial, and they complete the story of the defendant's sexual exploitation of A.C. Accordingly, evidence of these acts should be admitted as direct evidence of the crime charged in Count One.

In addition to being direct evidence of the crime charged in Count One, the defendant's threats and online posting of the Erotic Images are direct evidence of the crimes charged in Counts Two and Three of the Indictment: receipt and possession of child pornography. To convict the defendant of the crimes charged in Counts Two and Three, the government must prove beyond a reasonable doubt that the defendant knew he was receiving and possessing sexually explicit images from A.C. The defendant's postings on the fictitious social media accounts is strong evidence about what the defendant knew regarding the images of A.C. The defendant's statements about the images he threatened to post are circumstantial evidence that the defendant knew the images involved a minor engaged in sexually explicit conduct. In

12

particular, the jury may permissibly draw the inference that the defendant knew he possessed sexually explicit images based on the messages he sent from the Roush Facebook that the "nukes" would be "pulled" and that the defendant would do "something that will surely take this to a new level."

Additionally, the statement posted on the fictitious Twitch account is direct evidence of what the defendant knew about the images he received and possessed. Specifically, the statement: "yes this is a legal picture. No nudity at all, so stop complaining!" is evidence that the defendant was conscious of his guilt. The government will argue that the defendant knew he had obtained and posted sexually explicit images and that this post was an attempt to cover his tracks. Accordingly, the Court should admit evidence of the defendant's threats and harassment of A.C. and her family, including his posting of images of A.C. because it constitutes direct evidence of the defendant's knowing receipt and possession of child pornography as charged in Counts Two and Three of the Indictment.

### III. THE COURT SHOULD PRECLUDE ANY REFERENCE TO POSSIBLE PUNISHMENT

The Court should preclude any evidence, argument, or reference to the possible punishment the defendant may face if convicted of any of the crimes charged in the Indictment. Evidence or argument concerning mandatory minimum sentences and the possible punishment the defendant might face if convicted is irrelevant to the jurors' fact-finding task. As the Supreme Court has explained, this is because "of the basic division of labor in our legal system between judge and jury":

> The jury's function is to find the facts and to decide whether, on those facts, the defendant is guilty of the crime charged. The judge, by contrast, imposes sentence on the defendant after the jury has arrived at a guilty verdict. Information regarding the consequences of a verdict is therefore irrelevant to the jury's task.

13

Shannon v. United States, 512 U.S. 573, 579 (1994); see also United States v. Glick, 463 F.2d 491 (2d Cir. 1972) (explaining that jury's "function was to decide guilt or innocence and [] sentencing was the judge's province and his alone").  For this reason, "juries are not to consider the consequences of their verdicts" and should reach their verdicts "without regard to what sentence might be imposed." Shannon, 512 U.S. at 579 (internal quotation marks omitted); see also United States v. Blume, 967 F.2d 45, 49 (2d Cir. 1992).  Thus, "as a general matter, jurors are not informed of mandatory minimum or maximum sentences." Shannon, 512 U.S. at 586; see also United States v. Johnson, 62 F.3d 849, 850–51 (6th Cir. 1995) ("[E]very circuit to address this issue has held that a defendant is not entitled to an instruction about a mandatory sentence."); United States v. Harrison, 179 F. App'x 411, 412–13 (9th Cir. 2006) (district court properly refused to inform jury about 15-year mandatory minimum sentence).

    Exceptions to this general rule may exist where the jury plays a role in sentencing—i.e., death penalty cases—or where the jury has been affirmatively misled about sentencing consequences, in which case the jury's misperceptions may be corrected.  Accord Shannon, 512 U.S. at 579, 587–88; Pabon-Cruz, 391 F.3d at 95; and Polouizzi, 564 F.3d at 162.  However, in a non-capital case such as this one, the jury has no role in determining the defendant's sentence.  Instead, Congress has already determined the mandatory minimum penalties that apply.  Because the government will make no representations to the jury regarding the sentencing consequences of a conviction or acquittal, the possible punishment the defendant might face is simply not the jury's concern and is entirely irrelevant.  Indeed, providing such information "invites [jurors] to ponder matters that are not within their province, distracts them from their fact-finding responsibilities, and creates a strong possibility of confusion." Shannon, 512 U.S. at 579.

In particular, information about possible punishment poses the obvious danger that the jury will decide guilt not on the evidence presented but on whether the jury believes that the punishments fit the alleged crimes. In other words, such information would serve to facilitate jury nullification, a danger that this Court has an affirmative "duty to forestall or prevent." United States v. Thomas, 116 F.3d 606, 614–16 (2d Cir. 1997) (jury nullification is a violation of a juror's oath and courts may not permit jury nullification to occur "when it is within their authority to prevent"). For this reason, courts have repeatedly precluded evidence and argument about potential punishment on the grounds that it is irrelevant and unduly prejudicial. See, e.g., United States v. Pabon-Cruz, No. 02-3080 (2d Cir. Oct. 11, 2002) (where district court proposed to inform jury of mandatory minimum sentence applicable to advertisement of child pornography, Second Circuit granted government's motion for emergency stay and petition for writ of mandamus, and held that the "District Judge's proposed jury instruction regarding the penalties the defendant faces if convicted is a clear abuse of discretion in light of binding authority"); United States v. Graziano, 558 F. Supp. 2d 304, 326–27 (E.D.N.Y. 2008) (reference to mandatory minimum sentence should be precluded under Rule 403 because such information "creates a substantial danger that the jury will consciously or subconsciously allow knowledge of such punishment to impact on their deliberations on the question of the defendant's guilt or innocence" and thereby presents a "danger of unfair prejudice").

The Second Circuit has addressed this issue in the specific context of child pornography cases. In Pabon-Cruz, the Second Circuit relied on the Supreme Court's decision in Shannon in concluding that a defendant facing a mandatory minimum sentence in a child pornography prosecution had "no legal right to a charge informing the jury of the sentencing consequences of its decisions." Pabon-Cruz, 391 F.3d at 94. Pabon-Cruz left open the

theoretical possibility that such an instruction might be warranted in certain cases, but cited only the circumstance that had been hypothesized (but not actually found) in Shannon, namely, a case in which "the jury has been affirmatively misled by counsel or a witness." Id. at 95. More recently, in Polouizzi, the Second Circuit held that "[o]ur precedent forecloses the conclusion that [a defendant] had a Sixth Amendment right to trial by a jury that had been instructed on the applicable mandatory minimum sentence." Polouizzi, 564 F.3d at 160 (citing Pabon-Cruz, 391 F.3d at 94–95). The Second Circuit explained that, while a district court might have discretion in certain circumstances to provide jurors with an instruction regarding the applicable mandatory minimum sentence, such an instruction would be appropriate only where "instructing the jury on the consequences of its verdict will better ensure that the jury bases that verdict solely on the evidence and will better discourage nullification." Polouizzi, 564 F.3d at 162. Even assuming that a district court had the discretion to give such an instruction, the Second Circuit concluded that it would not be an abuse of discretion "to decline to instruct the jury on the mandatory minimum sentence." Id. at 161–63. Here, evidence, argument, or instruction about the possible punishment the defendant might face would not discourage jury nullification, but rather would distract the jury from its determination of the defendant's guilt. Accordingly, the Court should preclude any evidence, argument or reference to the possible punishment the defendant may face if convicted.

## CONCLUSION

For the reasons set forth above, the Court should grant the government's <u>in limine</u> motions.

Dated: Brooklyn, New York
June 26, 2017

Respectfully submitted,

BRIDGET M. ROHDE
Acting United States Attorney
Eastern District of New York
Attorney for Plaintiff
271 Cadman Plaza East
Brooklyn, New York 11201

By: /s/ Drew G. Rolle
Drew G. Rolle
Assistant United States Attorney
(718) 254-6783